(C.D. 4096)

AMPEX CORPORATION
AIR EXPRESS INT'L CORP. ET AL. } *v.* UNITED STATES

---

United States Customs Court, Second Division

(Decided October 20, 1970)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Peter Jay Baskin*, trial attorney), for the defendant.

Before RAO, FORD, and NEWMAN, Judges; NEWMAN, J., dissenting

FORD, Judge: The cases listed in schedule "A," annexed hereto and made a part hereof, consolidated for the purpose of trial, cover importations of television camera cables used to connect the camera head and control unit of the Mark VII color television system. The cables were classified as insulated electrical conductors with fittings under the provision contained in item 688.15, Tariff Schedules of the United States, and assessed with duty at the rate of 17 per centum ad valorem.

Plaintiffs contend that said cables are properly subject to duty at the rate of 10 per centum ad valorem as television apparatus or as parts of television apparatus under item 685.20, Tariff Schedules of the United States.

The pertinent portions of the provisions involved herein read as follows:

|  |  |  |
|---|---|---|
|  | Insulated (including enamelled or anodized) electrical conductors, whether or not fitted with connectors (including ignition wiring sets, Christmas-tree lighting sets with or without their bulbs, and other wiring sets): |  |
| 688.05 | Without fittings_____ | * * * |
|  | With fittings: |  |
| 688.10 | Christmas-tree lighting sets, with or without their bulbs, and wiring sets similar thereto_____ | * * * |
| 688.15 | Other _____ | 17% ad val. |

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus, and television cameras; record players, phonographs, tape recorders, dictation recording and transcribing machines, record changers, and tone arms; all of the foregoing, and any combination thereof, whether or not incorporating clocks or other timing apparatus, and parts thereof:

685.10       Television cameras, and parts thereof____     * * *

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus, and parts thereof:

685.20       Television apparatus, and parts thereof _____ 10% ad val.

The record consists of four exhibits received on behalf of plaintiffs and the testimony of one witness, Donald F. Smith, called by plaintiffs. Exhibit 1 consists of a domestically produced standard cable. Exhibits 2 and 3 consist of pages 6, 10 and 11 of a brochure. Exhibit 2 is a block diagram of a color video transmission set up while exhibit 3 consists of photographs of a color camera. Exhibit 4 lists and identifies the 101 pins contained in the fitting of the imported cable. Since the issue involved is basically a question of law, the testimony regarding the operation of color television equipment, while interesting would not be controlling and shall therefore not be set forth in the decision. It is sufficient to state that the record establishes the importations consist of both light weight and standard color television cable. Each cable has both a male and female fitting containing 101 pins or connecting points. All of the pins are not used, some being spares. The cable is dedicated and has no other use than with the Mark VII color television system. It is used only to connect the camera control unit with the camera head within the system. Inside each cable are numerous insulated and shielded conductors which carry various electronic impulses. These impulses are of low voltage and current and do not constitute electrical power.

Item 688.15, *supra*, under which the imported merchandise was classified provides in its superior heading for ignition wiring sets and Christmas tree lighting sets in addition to insulated electrical conductors with or without fittings. It is noted by the court that all of the articles therein are devices used in connection with electric power. The record establishes the imported cables to be used solely for the transmission of electronic impulses of very low voltage and current.

It would be impossible to use such cables for electric power transmission since the size (gauge) of the wire is too small. It would appear to us that the imported cable is not any more the kind of article covered by the superior heading involved than were the jacks and plugs involved in *Midland International Corporation* v. *United States*, 62 Cust. Ct. 164, C.D. 3715, 295 F. Supp. 1101 (1969). In the *Midland* case, *supra*, the classification was under item 685.90 which included electrical switches, relays, fuses, lightning arresters, plugs, receptacles, etc. The merchandise consisted of certain connectors, phone jacks, phone plugs, etc., used in low current electronic circuits such as communications equipment, phonographs, dictating machines, tape recorders, etc. We there held such imported merchandise not to be *ejusdem generis* with the article set forth in the superior heading and therefore the classification was erroneous. Plaintiff, however, failed to overcome the presumption of correctness and the protest was overruled without affirming the classification.

We are of the opinion that the merchandise intended to be covered by item 688.15, *supra*, as indicated by the superior heading covering said item was electric power wire and wiring devices. Merchandise not having the capabilities of handling electric power but being limited to low current electronic impulses is not covered by such provision. The classification, therefore, is erroneous.

In order for plaintiffs to prevail, their burden is to establish the imported articles to be television apparatus. The term apparatus has been given a broad interpretation by judicial decision.

In the case of *United States* v. *Wyman & Co.*, 2 Ct. Cust. Appls. 440, T.D. 32200 (1912), the court set forth the following definition of apparatus in determining that a container for liquid sulphurous acid was within said term:

> The word "apparatus" is defined by the Century Dictionary as—

> An equipment of things provided and adapted as a means to some end; especially, a collection, combination, or set of machinery, tools, instruments, utensils, appliances, or materials intended, adapted, and necessary for the accomplishment of some purpose, such as mechanical work, experimenting, etc.; as, chemical, philosophical, or surgical apparatus.

> The definition of "apparatus" in Webster's New International Dictionary is as follows:

> 2. Things provided as means to some end.
> 3. Hence: A collection or set of implements, or utensils, for a given work, experimental or operative; any complex instrument or appliance, mechanical or chemical, for a specific action or operation; machinery; mechanism.

In *Happel & McAvoy* v. *United States*, 47 Treas. Dec. 258, T.D. 40727 (1925), the court held a certain machine used for treatment of cancer patients which contained an electric motor to fall within the purview of scientific apparatus under the Tariff Act of 1922. In doing so, it made the following observation after considering the meaning of the term "apparatus":

> * * * The entity which must be considered for tariff purpose is unquestionably a "scientific apparatus," composed, if you will, in part of an electric motor. Apparently, Congress advisedly used the word "apparatus" in order to cover units made up of combinations of articles similar to those involved in the present importation. As defined in "Corpus Juris," and amply supported by judicial decisions, the term apparatus is—
>
>> A generic word of the most comprehensive signification; implements; an equipment of things provided and adapted as a means to some end; any complex instrument or appliance for a specific action or operation, of which mechanical or chemical instruments are given as examples; a full collection or set of instruments for a given duty, experimental or operative; things provided to some end, especially a full collection or set of implements or utensils for performing scientific experiments or operations.

In "Words and Phrases" (vol. 1, p. 439), we find the following:

> "Apparatus," as used in a contract by an electric light company for "new apparatus," means the full set of necessary machinery as furnished, and not merely dynamos and lamps. The definition of the word "apparatus" given in Webster's Dictionary is a full collection or set of implements for a given duty, experimental or operative. This definition is implied in the derivation of the word. These implements or agencies may be numerous and various in character, but are all united in a common function.—Morrison v. Baechtold (48 Atl. 926, 928, 93 Md. 319).

The Oxford Dictionary gives the word its literal Latin derivation or translation "to make ready for" and defines it as follows:

> 1. The work of preparing; preparation, preparatory arrangement, array.
> 2. The things collectively in which this preparation consists, and by which its processes are maintained; equipments, material, mechanism, machinery, material appendages or arrangements.
> 3. The mechanical requisites employed in scientific experiments or investigation.

Without attempting to construe the word, as used in paragraph 360, in the broadest interpretation of which it is susceptible in the ordinary use and common understanding thereof, we feel that the present importation is fairly within the congressional scope of the provision, and we so hold.

It is readily apparent from the foregoing that the term "apparatus" is collective in the sense that it is intended to encompass a group of devices to be used for a given end. Such interpretation is indicated in a case involving color television transmission. The overall equipment necessary for transmission is not a single article but a collection of various components such as the camera head, camera control panel, codes, power supply unit, monitor and operational control panels and decoder as indicated in the block diagram received in evidence as plaintiffs' exhibit 2. It is apparent that the entire collection and each component constitutes apparatus within the purview of item 685.20, *supra*.

In view of the foregoing, it is unnecessary to consider the alternative claim of plaintiffs as parts under said item 685.20. The protest insofar as it claims the contested merchandise to be television apparatus in item 685.20 is therefore sustained except for merchandise covered by entry 4957 of protest 68/289, which, having been abandoned, is dismissed.

Judgment will be entered accordingly.

## DISSENTING OPINION

NEWMAN, Judge: I must dissent.

The record in this case clearly establishes that the television camera cable serves the function of allowing *electrical* current to flow from the camera head to the camera control unit, and from the camera control unit back to the camera head.

The fact that the television camera cable is an electrical conductor does not appear to be disputed in plaintiffs' brief. Rather, plaintiffs' position is predicated upon the doctrine of relative specificity, viz., that item 685.20 is more specific than item 688.15. Hence, I do not perceive any genuine dispute between the parties relative to the fact that the imported cable is an insulated electrical conductor as described by item 688.15.

The majority, however, holds that the imported cables are not described in item 688.15 primarily on the basis of a distinction made between "low current electronic impulses" and "electric power." Such distinction may very well exist in the field of electricity, but such distinction does not, it seems to me, have applicability to the facts in this case.

The record shows that the imported cables conduct *both* "signal" and "power" current "to make the camera work" (R. 36). This fact, in my view, does not exclude the cables from the purview of item 688.15. Under the language of the statute, the *amount* of electrical

current or power carried by the conductor does not appear to be a significant factor in classification. Instead, it is the *use or function* of the article for conducting electricity which is controlling. Whether the thing conducted by these cables is regarded as signal current, power current, or "impulses," the record does not establish that anything other than electric current was carried by the cables. The fact that there are 101 pins within the cable, each directing a separate flow of electrical current *so that a specific electronic operation could take place in the camera head or control unit*, does not alter the fact that the cable merely serves the function of allowing the flow of electrical current.

Further, the majority opinion points out that the superior heading to item 688.15 provides for ignition wiring sets and Christmas tree lighting sets "in addition to insulated electrical conductors with or without fittings" (slip op., p. 4). In this connection, the majority cites *Midland International Corporation* v. *United States*, 62 Cust. Ct. 164, C.D. 3715, 295 F. Supp. 1101 (1969), for the application of the doctrine of *ejusdem generis*.

I do not view the *Midland* case as apposite:

First, *Midland* construes item 685.90, which is an entirely different kind of provision than item 688.15 in phraseology and substance. Second, I do not see how *ejusdem generis* [1] is applicable to determining what is an insulated electrical conductor under item 688.15. The parenthetical clause commencing with the word "including" does not, in my opinion, *limit* the scope of insulated electrical conductors to those which are *ejusdem generis* with those described *eo nomine* (ignition wiring sets and Christmas tree lighting sets) ; but on the contrary, the parenthetical clause was intended by Congress to *extend* the provision for insulated electrical conductors to the articles named, which might not otherwise be considered as covered by item 688.15. Cf. *United States* v. *Kimball Dental Mfg. Co.*, 19 CCPA 353, 359, T.D. 45501 (1932). If *ejusdem generis* is applicable at all to item 688.15, it would merely aid in determining the scope of "other wiring sets" in the parenthetical language.

In light of the record and the foregoing observations, I have concluded that the imported cables are described in both item 688.15 and

---

[1] For the layman :

Black's Law Dictionary, rev. Fourth Ed., p. 608, defines *ejusdem generis* as follows : "Of the same kind, class or nature.

"In the construction of laws—the 'ejusdem generis rule' is that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. *Black, Interp. of Laws*, 141 ; *Goldsmith* v. *U.S.*, C.C.A.N.Y., 42 F. 2d 133, 137 ; *Aleksich* v. *Industrial Accident Fund*, 116 Mont. 69, 151 P. 2d 1016, 1021—."

in item 685.20. Consequently, it follows that the issue in this case must be resolved on the basis of which of the two tariff provisions that describe the articles is the more specific. See General Interpretative Rules 10(c) and 10(ij).

Insulated electrical conductors, although taking a variety of forms,[2] are essentially one kind of device. Television apparatus, on the other hand, is comprised of an entire group of varied kinds of devices, as is pointed up by the following material quoted from plaintiffs' brief, pages 14–15:

> The following are identified as the components of a picture transmission portion of a television broadcast system in the book *Television Broadcasting* in the Chapter "Television Systems Fundamentals" (p. 1, * * *):
>
>> The picture-transmitting portion of a television broadcasting system consists, essentially, of a television camera for converting optical images into electrical waves, amplifiers for increasing the amplitude of this electrical energy, synchronizing generators for producing the control pulses necessary to lock the receivers in step with the transmitter, control equipment for the monitoring and adjustment of the television signal, means for carrying the electrical replica of the optical image (together with the synchronizing pulses) from the point of origination to the transmitter, a radio transmitter for converting this electrical energy into radio-frequency energy, and, finally, an antenna system for radiating this radio-frequency energy into space.[3] [Emphasis by plaintiff omitted.]

It is clear, then, that the television camera cables herein are more narrowly and specifically described in item 688.15 than in 685.20.

For the reasons discussed, I would affirm the Government's classification and overrule the protest.

(C.D. 4097)

---

[2] See *Explanatory Notes to the Brussels Nomenclature,* Vol. 3, p. 1458–59 (Heading 85.23).
[3] See also *Explanatory Notes, supra,* p. 1435 (Heading 85.15(B)).